# EXHIBIT A

"C O N F I D E N T I A L"

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

```
STEPHENIE ROSE, on behalf      )
of herself and all others      )
similarly situated,            ) NO. CV 11 02390
        Plaintiffs,            ) EJD
         v.                    )
BANK OF AMERICA                )
CORPORATION, and FIA CARD      )
SERVICES, N.A.,                )
        Defendants.            )
-------------------------x     )
CAROL DUKE and JACK            )
POSTER, on behalf of           ) NO. CV 12 04009
themselves and all others      ) EJD
similarly situated,            )
        Plaintiffs,            )
         v.                    )
BANK OF AMERICA                )
CORPORATION, and FIA CARD      )
SERVICES, N.A.,                )
        Defendants.            )
```

DEPOSITION OF DANA WASSAM

PHILADELPHIA, PENNSYLVANIA

JANUARY 9, 2013

REPORTED BY:
SILVIA P. WAGE, CCR, CRR, RPR
JOB NO. 56924

therefore eligible to be passed to the dialer for that particular phone number.

If consent is not identified in one of the three data sources, then an indicator is added to the account to denote that they cannot receive automated contact attempts on their mobile number.

And, when the dialer lists are built, that indicator is one of the inputs to determining which accounts and phone numbers for the account are eligible to be passed to the auto dialer.

Q. I see. It is a complicated process.

A. It is.

Q. Okay. Going back to the first step, and I, again, was trying to write while you were talking. I hope I tried to keep up with you there.

But you said you reviewed the numbers. What do you mean by reviewing the numbers, is this done with each campaign or on a monthly basis, on a yearly basis?

A. There is a daily process that's run to evaluate all of the delinquent account inventory for credit card accounts.

CONFIDENTIAL - DANA WASSAM

Q. For all the accounts?
A. All delinquent accounts.
Q. All delinquent accounts.
That could be in the millions?
A. It could.
Q. It's a lot of accounts, but you do that every day?
A. Uh-huh.
Q. Okay. You have to say yes.
A. Yes.
Q. Thank you.
Okay. So every day they review the numbers and every day they compare that to the Telecordia data?
A. Yes.
Q. And that's all done by computers I take it?
A. It's done systemically.
Q. Okay. And you said if it's a mobile number that's on the list, three data sources are consulted. Which sources are those?
A. The original account data provided at the time of credit card application, on-line banking data and there's also a table within

Report Net that houses consent obtained during verbal conversations with customers through the collections process.

Q. And so when you say, they review the original account data, would that be like an application?

A. Yes.

Q. Would there be any other account data besides the application that you're talking about --

A. No.

Q. -- in that original category?

A. No. Sorry, I did say, no.

Q. And I want to make sure she got the end of the question. Thank you.

And, in the application, can you tell me what field or box or area would be looked at to determine whether or not consent was obtained?

A. In the card terms and agreements, the customer is notified that we will use any numbers they provide for auto dial. So any of the phone number fields on the application are eligible for consideration.

Q. So, if on the application they listed

space, there is a specific notification.

The other place is related to their overall relationship with the bank. I do not know if there's specific verbiage in that location. But, again, our account terms and agreements do notify the customer that any number they provide will be used for auto dial as well.

Q. Okay. So it goes back to the card terms and agreements, even if there's nothing specific in the on-line banking?

A. Again, I do not know in -- I mentioned there are two locations within on-line banking. One I know has specific verbiage. The other I'm not certain whether it does have specific verbiage or not.

Q. Okay. You said in 2012 that was added. Prior to 2012 --

A. The collections functionality, specifically, was launched in 2012. Customers have been able to provide updated profile information on on-line banking as long as I've been familiar with on-line banking.

Q. Okay. And it's just in 2012 they were notified, specifically, as to the

collections function that if the cell phone was provided, you would be allowed to contact them via an auto dialer on their cell phone?

A. Within the collection pages, yes.

Q. Okay. And I think the third area you said that if it's reported in a table in Report Net that a collection agent has contacted or spoken to the call recipient and at some point they have told them verbally that it's okay to contact them on the cell phone or they've given them the cell phone; is that your testimony?

A. That's correct.

Q. Okay. Just so I'm clear, if the person calling the cell phone just gave the cell phone number in response to a request that, you know, what is your cell phone number, and they gave the cell phone number, is there any other admonition or warning to the call recipient that you understand that we can now call you with an auto dialer?

MR. REIDY: Lacks foundation, beyond the scope.

Go ahead and answer it, if you can.

A. I don't know if I fully understand

our resources in trying to contact customers who we know have a high likelihood to pay anyway.

So, while it may be eligible to be sent to the auto dialer, our strategy will not result in it being sent because we do not want to spend the bank's resources on someone who will self-cure.

Q. Makes sense.

Okay. Are there any other factors besides the risk factors that would relate to perhaps the type of consent or how the consent was obtained that would determine whether or not you may or may not send it to the auto dialer?

A. There are a number of other factors that would be used to determine if it's sent to the auto dialer. Those related to consent are the ones I've already described.

Q. Okay. And if somebody calls and says, you know, I don't want you to call my cell phone anymore with an auto dialer, even though it's been eligible on Day 1, but on Day 2 they call and say, don't do this anymore, I don't want you to do it, then on Day 3 would that analysis be done and would that number be taken off the eligible list?

A. The number would be taken off of the eligible list. Based on the timeline that you just described, it may not be that exact timeline because it may depend on the time of day that the customer notified us --

Q. Okay.

A. -- of their desire to change their consent and based on the timing with which all of the bank's core systems are updated from a -- we internally refer to it a file maintenance perspective on an nightly basis.

The customer may request to change that consent or tell us to stop calling them on any number, mobile or landline, after the nightly processing has already started. So it may not be applied on Day 3, as you describe, but it would be applied on Day 4, in that example.

Q. Okay. And so that's one of the reasons why you do this on a daily basis --

A. That's correct.

Q. -- to make certain you get not only the eligibility but the people that have declined or revoked the consent at some point?

A. That's correct.

regulation that you knew of and --

A. We had a procedural change within our business, which I described previously in the testimony.

Q. Thank you. That clears it up. I appreciate it.

And, prior to that system going into place, in or about July 2011, when an agent, a collection agent, would speak to an account holder about the phone, the cell phone, the consent, the lack of consent or whatever, were there any policies or procedures in place that directed them to take certain action or engage in certain conduct regarding whether or not consent was given to be called on a cell phone by an auto dialer?

A. Not to my knowledge.

Q. Okay. I understand there is a 13-month retention period for consent information prior to July 2011; is that accurate? Does that make any sense to you?

A. We had prior to the legal hold notice that was received for this case a 13-month retention period for our dialer data.

data was?

A. I don't believe that I've testified nor do I believe that Paul testified that our associates were educated to request consent before July 2011.

Q. Okay.

A. So what conversations are you referring to before July 2011?

Q. There are account notes for each account, right?

A. There are generally account notes on the system of record.

Q. Okay. And, in the account notes, isn't that a place where it would indicate whether or not the person -- the account holder would provide consent to be called on their cell phone on occasion; isn't that where it was maintained prior to July 2011?

A. If the associate happened to have a conversation that said, may we call you on your cell phone number, they may have put it in the notes.

Q. Okay.

A. But we didn't instruct our associates

to follow any specific procedures to request consent specific to an auto dialer because we weren't retaining that information in a manner that could be systemically utilized to pass the data to the auto dialer.

Q. Fair enough. That answers the question for me. Thank you. It clears it up for me.

Bear with me. I'm an outsider looking into your system and trying to understand it.

And I understand the Report Net information that you've used to compile the data produced in January and also in earlier discovery requests go back to July 1st, 2010 only, right?

A. That's correct.

Q. And why is it only going back to that date, what's your understanding?

A. As we talked about previously, the retention period for those tables was 13 months. At the time that we received guidance from our legal counsel to begin retaining data, we implemented that change to the retention for the legal hold notice. And, when that was implemented, it allowed us to retain data from

C E R T I F I C A T E

I, SILVIA P. WAGE, a Certified Court Reporter, Certified Realtime Reporter, Registered Professional Reporter and Notary Public do hereby certify that, pursuant to notice, the deposition of DANA WASSAM, was duly taken at REED SMITH, LLP, One Liberty Center, 1650 Market Street, 24th Floor, Philadelphia, Pennsylvania on Wednesday, January 9, 2013, at 10:06 a.m. before me.

The said witness, DANA WASSAM, was first duly sworn by me according to law to tell the truth, the whole truth and nothing but the truth and thereupon did testify as set forth in the above transcript of testimony. The testimony was taken down stenographically by me.

I do further certify that the above deposition is full, complete and a true record of all the testimony given by the said witness.

Dated: January 22, 2013

__________________________________________

SILVIA P. WAGE, a Certified Court Reporter, Certified Realtime Reporter, Registered Professional Reporter and Notary Public