Joseph Darrell Palmer (SBN 125147)
darrell.palmer@palmerlegalteam.com
Law Offices of Darrell Palmer PC
2244 Faraday Avenue, Suite 121
Carlsbad, CA 92008
Telephone: (858) 215-4064
Facsimile: (866) 583-8115

Attorneys for Objectors James Kirby and Susan House

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHENIE ROSE, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, and FIA CARD SERVICES, N.A.,<br><br>Defendants. | Case No. 5:11-cv-02390-EJD (PSG)<br><br>**RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR RECONSIDERATION OF ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR ATTORNEYS' FEES AND COSTS**<br><br>Date: October 10, 2015<br>Time: 9:00 a.m.<br>Judge: Hon. Edward J. Davila |
| CAROL DUKE AND JACK POSTER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.; BANK OF AMERICA CORPORATION; AND FIA CARD SERVICES, N.A.,<br><br>Defendants. | Case No. 5:12-cv-04009-EJD (PSG) |

0

## I. Introduction

This motion is a neon sign spelled "conflict." The court's Order Granting Final Approval and Granting/Denying the Fee Motion (Doc. 108) increased the monetary benefit from the settlement for class members by $5,618,732.09. This court fulfilled its duty as explained in *Staton v. Boeing Co.*:

> "In setting the amount of common fund fees, the district court has a special duty to protect the interests of the class. On this issue, the class's lawyers occupy a position adversarial to the interests of their clients. The reason for the usual insistence upon judge-conferred common fund fees is that, as we have explained, "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." (*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir.1994))
>
> Accordingly, fee applications must be closely scrutinized. Rubber-stamp approval, even in the absence of objections, is improper. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir.2002) See also *In re Coordinated Pre-trial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 608 (9th Cir.1997) ("In a common fund case, the judge must look out for the interests of the beneficiaries, to make sure that they obtain sufficient financial benefit after the lawyers are paid. Their interests are not represented in the fee award proceedings by the lawyers seeking fees from the common fund").

*Staton v. Boeing Co.*, 327 F.3d 938, 967-68 (9th Cir. 2003)

Earlier this month, Justice Richard Posner explained even further:

> But the law quite rightly requires more than a judicial rubber stamp when the lawsuit that the parties have agreed to settle is a class action. The reason is the built-in conflict of interest in class action suits. The defendant (as RadioShack's lawyer candidly admitted at the oral argument) is interested only in the bottom line: how much the settlement will cost him. And class counsel, as "economic man," presumably is interested primarily in the size of the attorneys' fees provided for in the settlement, for those are the only money that class counsel, as distinct from the members of the class, get to keep. The optimal settlement from the joint standpoint of class counsel and defendant, assuming they are self-interested, is therefore a sum of money moderate in amount but weighted in favor of attorneys' fees for class counsel.

*Redman v. Radio Shack Corp.*, 2014 WL 4654477, Nos. 14–1470, at *4 (7th Cir. Sept. 19, 2014)

And Justice Posner also explained the importance of this opposition by objectors:

> Critically the judge must assess the value of the settlement to the class and the reasonableness of the agreed-upon attorneys' fees for class counsel, bearing in mind that the higher the fees the less compensation will be received by the class members. When

there are objecting class members, the judge's task is eased because he or she has the
benefit of an adversary process: objectors versus settlors (that is, versus class counsel and
the defendant).

*Redman* at *4.[1]

According to Daniel Hutchison (Doc. 105), the settlement administrator processed 226,107 valid claims. Even after a modest award of fees to objectors' counsel from the $5,618,732.09, class members will receive an additional $23.11 per claim.

### A. The Court's Ruling

Class counsel asked for $8M, the court approved $2.4M; the class saved $5.6M. Only 1700 of the lodestar hours warranted payment, but that still works out to $938/hour for the originally submitted lodestar ($2,402,243 divided by the 2,560 hours), or $1,412/hour for the 1700 approved hours ($2,402,243.91 divided by 1700 hours), hardly a manifest injustice.

The court refused to pay attorneys for duplicative work (eighteen attorneys, ten law firms, and eight paralegals) and duplicative lawsuits. Setting a great example, this court conducted a thorough review of the lodestar including totaling information provided by the multiple firms at various stages, in particular with the hours claimed in two stages. The hours claimed for settlement negotiations were adjusted from 800 to 400, noting a client would not pay for so many attorneys to handle settlement negotiations. The court also reduced the number of hours claimed for investigating and filing the lawsuits. Six lawsuits were consolidated in this case; the court found that only two were duplicative (although all of the lawsuits involved overlapping claims). Noting duplicative lawsuits should not be filed because of the first to file rule, the court determined that a group of attorneys were working together. The same pattern, involving the same four law firms, had occurred in *Arthur v. Sallie Mae*, 10-CV-198-JLR (W.D. Wash.) Concluding the attorneys had been pursuing a deliberate policy of filing duplicative lawsuits to intimidate the defendant and looking out for the class' funds, the court refused to pay for another 560 hours. The multiplier requested was 5.34, but with the approved adjusted lodestar, a

---

[1] Objector's counsel, Darrell Palmer and Ted Frank represented the *Redman* appellants.

25% award would result in a 8.65 multiplier. Analyzing the lodestar factors, the court determined that two factors (the risks of continuing litigation and skill of the attorneys) weighed in favor of the requested lodestar, but the results obtained and the contingency rationale did not. The court compared the results obtained to that achieved in other TCPA cases; specifically, other TCPA cases resulted in higher monetary awards for class members and more tangible injunctive relief. The court reduced the multiplier to 2.59 – the same multiplier granted in *Arthur v Sallie Mae*.

### B. The Arguments Do Not Support Reconsideration

Class counsel argue post-judgment reconsideration of a motion under Rule 59(e) is appropriate where "(1) the motion is 'necessary to correct manifest errors of law or fact upon which the judgment is based;' (2) the moving party presents 'newly discovered or previously unavailable evidence;' (3) the motion is necessary to 'prevent manifest injustice;' or (4) there is an 'intervening change in controlling law.'" Doc. 110, page 5, *citing Turner v. Burlington Northern Santa Fe R.R.*, 338 F.3d 1058, 1063 (9th Cir. 2003). They do not specify which of the four valid grounds supports this motion. Class counsel claim "the Order is not supported by a fulsome review of the undisputed material facts central to the Settlement." (Doc. 110, p 5) They provide brief excerpts of deposition testimony and imply there was manifest injustice.

### C. Bank of America's Practice Changes Predated this Litigation.

Class counsel: "the prospective practice changes effected meaningful change." (Doc. 110, p 6) "As a direct result of these lawsuits and the prospective practice changes secured by Class counsel in this Settlement, every Class member who wants the automated calls to stop has the ability to make the calls stop. The practice changes that Class counsel achieved are a tremendous result and will benefit every Class member." (Doc. 110, p 7)

Those changes did not occur because of these lawsuits or even after the lawsuits were filed. According to Alexander Burke, Bank of America realized it may need to change its policies to comply with the TCPA as early as 2010, and had already been meeting with the FCC regarding the TCPA, long before *Rose* filed in May of 2011. See Doc. 110-6. Page 4, stating "Indeed, **apparently realizing that**

3

**the TCPA presented a problem for it even before these actions were filed, Bank of America had a meeting with the FCC to discuss proposed changes** to the definition of "prior express consent" on October 26, 2010: http://apps.fcc.gov/ecfs/document/view?id=7020918939". Of course they were making changes; Bank of America has lots of very smart lawyers who were watching the wave of TCPA cases, including Sallie Mae.

Class counsel argue Bank of America changed its policies and procedures with excerpts from the deposition of Laura Guidici. The deposition occurred on June 28, 2012, approximately ten months after filing the *Ramirez* litigation. (Doc. 110-2) Guidici was asked about changes made in the last eight months but her responses draw no causal relationship between the policy changes and the lawsuit.

```
10    A. And remember, they're not placing
11 auto-dialed calls to cell phones. They're manually
12 called, at which point consent in the new format
13 would be collected.
14    Q. And that's been true only in the last
15 eight months?
16    A. Or so, yes.
```

Doc 110-2, page 7 [Guidici tr., page 172]) It's unlikely Bank of America could or would change its policies within a month of being served with a lawsuit. These changes were coincidental. Companies were struggling to comply with FCC pronouncements and new policies. Although Ms. Guidici refers to some changes that may have occurred in the previous eight months – "or so" – she was vague on documentation, when it may have been created, and did not recall producing any such documentation for the litigation:

```
17    Q. Okay. All right. Maybe I've asked you
18 this but -- undoubtedly I have.
19    Where do I go to find that new
20 procedure that has been implemented in the last
21 eight months, this suppression procedure for those
22 cell phones that have been identified through a
23 systemic process so they're sort of embargoed until
24 consent is obtained?
25 A. I would need to find out who is holding
(Begin Page 8) that documentation and, of course, work with our
2 legal team.
```

4

> 3 Q. Do you believe that document was
> 4 produced?
> 5 A. I'm not certain that that document was
> 6 produced, but I can work with them and see what we
> 7 can obtain.
> 8 Q. Do you think there is a document that
> 9 would reflect that change?
> 10 A. That sends us a system change, the
> 11 systemic control?
> 12 Q. Yes.
> 13 A. There is documentation around the
> 14 control.
> 15 Q. **And would there also have been a text**
> 16 **or E-mail sort of announcing that new systemic**
> 17 **control?**
> 18 **A. I don't recall.**
> 19 **Q. Do you have any recollection of what**
> 20 **that document might be called? Who might have**
> 21 **generated it? Anything?**
> 22 **A. No. No, I don't.**
> 23 **Q. Okay. You don't recall locating and**
> 24 **providing that document to counsel to produce in**
> 25 **this case?**
> 1 **A. I do not.**
> 2 Q. Okay. And your testimony is right now
> 3 and for perhaps the last eight months, regardless of
> 4 how the cell phone got into any of the fields in the
> 5 AS400 system, if it's identified as a cell phone,
> 6 it's not called until verification is provided?
> 7 A. That is correct.
>
> Doc 110-2, page 7-9. [Guidici tr., page 172-174]

At most, Bank of America was already addressing changes it needed to make because of new policy pronouncements from the FCC. Class Counsel argue that they have achieved meaningful change in Bank of America's policies, but do not address the court's central concern – that Bank of America did not agree to change its definition or approach to the question of "prior express consent." The "prospective relief" touted by the Settlement Agreement merely provides that Defendants will call no one unless Defendants had that person's prior express consent. As the court noted:

> But because Defendants continue to use the same definition of "prior express consent," it would appear that most, perhaps all, Class Members will continue receiving automated

5

CASE NO. 5:11-cv-02390-EJD
OPPOSITION TO CLASS COUNSEL'S MOTION FOR RECONSIDERATION

> calls. Because the primary goal of this litigation, as described by Class Counsel, was to put an end to these phone calls, the touted relief falls short and is of particular concern.

(Doc. 108, p 19) Although changes in Bank of America's computer systems now apparently make it easier for clients to withdraw their consent or affirmatively request they not be subject to the unwanted calls, it is not clear that lacking those affirmative steps, whether the class is in a meaningfully different position than they would have been had the lawsuits not been brought.

### D. There Was No Error in Recovery Estimates

Argument that the court erred in concluding the benefits for the class were unimpressive misstates the court's conclusion. The assessment of the recovery was based on analysis of both the practice changes Class Counsel claim they achieved for the class, ***and*** the monetary portion of the Settlement. (Doc. 108, p 17-20). There was no indication of the relative weight given to these factors. Class Counsel assert the court erred in concluding that Class Members would only receive between $20 and $40. But the language was precise "Counsel *estimated*, at the time they filed the instant motions, that claimants will receive an average recovery of between $20 to $40." (Doc. 108, p 18) The comparison to the recovery in *Sallie Mae* was likewise based on the *estimated* recovery: "The monetary relief in this case, however, lines up with that achieved in *Arthur v. Sallie Mae*, where each claimant was *estimated* to receive between $20 and $40." *Id.* Class Members in *Sallie Mae* did receive more and class counsel knew that at the September 14, 2012 final approval hearing where the same class counsel projected a $116/claimant payout estimate.

Class Counsel now revise their payout estimate and argue error. The court's use of estimated recoveries reflects the reality that Class Counsel routinely request final approval for settlements prior to submission of claims information. This often works to the benefit of Class Counsel, as they can project a higher claims rate than they achieve and a higher settlement fund (in a claims made case), or higher percentage of claims submitted where needed to show notice procedures were adequate. Class Counsel structured this settlement so the court would be asked to rule on the fairness of the settlement without the benefit of complete claims information; they cannot now ask the court, with the benefit of hindsight, to grant them higher fees because a low claims rate has resulted in higher recovery per class member.

6

Instead, they should be penalized not rewarded for a low claims rate and these objectors foresee new rules where class counsel will be responsible for low claim rates as a reflection of their insufficient efforts to deliver settlement benefits to their clients.

In addition, Class Counsel's assertions regarding the actual results achieved per class member obscures the fact (like Sallie Mae) numerous Bank of America entities have been released. This settlement resolves claims related to both Bank of America's credit card division and its mortgage servicing arm. Although Class Counsel now estimate that some class members who received mortgage calls and credit card calls and/or text messages will recover between $110 and $120 – they do not appear to acknowledge these Class Members will have been subjected to two discrete sets of violations, giving rise to double the statutory damages for a single violation.

Although claimant Class Members are likely to receive more than $20-$40, class counsel has not shown a factual error meriting reconsideration.

### E. Duplicative Litigation

The court determined Class Counsel should not be compensated for pre-mediation work completed in *Duke* (consolidated in this action) and *Johnson v. Bank of Am. Corp.*, Case No. 14-CV-02177-EJD (N.D. Cal.) because the cases are "substantially similar" to *Rose* and *Ramirez v. Bank of Am., N.A.,* Case No. 14-CV-02175-EJD (N.D. Cal.). (Doc. 108, p 15) Now they claim "The Litigation Strategy Enhanced Efficiency and Saved the Class Millions of Dollars" (Argument III). The combination of claims related to both the credit card divisions and the mortgage servicing divisions of Bank of America may have saved notice and administration expenses – this much is true. Class Counsel have ignored the point:

> Normally, the Court would expect that Duke and Johnson would never have been filed due to the first-to-file rule. Or, if the subsequent filers were unaware of Rose and Ramirez, Defendants would have moved (likely successfully) to have Duke and Johnson dismissed.

(Doc. 108, p 1115) Class Counsel fail to admit they violated the first-to-file rule. As noted in *Best W. Int'l, Inc. v. Mahroom*, CV07-827-PHX-JAT, 2007 WL 1302749 (D. Ariz. May 3, 2007):

7

CASE NO. 5:11-cv-02390-EJD
OPPOSITION TO CLASS COUNSEL'S MOTION FOR RECONSIDERATION

This doctrine, known as the first-to-file rule, 'gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts, to the party who first establishes jurisdiction.' *Northwest Airlines, Inc. v. American Airlines, Inc.*, 989 F.2d 1002, 1006 (8th Cir.1993). The rule 'serves the purpose of promoting efficiency well and **should not be disregarded lightly**.'Church of Scientology of California v. United States Dep't of Army, 611 F.2d 738, 750 (9th Cir.1979).

*Best W. Int'l* at *1 (emphasis added).

There's no respect for the overburdened judiciary by boasting about filing duplicative lawsuits. They ignore the policy issues behind the first to file rule:

The purpose of the comity principle is of paramount importance. The doctrine is designed to avoid placing an unnecessary burden on the federal judiciary, and to avoid the embarrassment of conflicting judgments. *Great Northern Railway Co. v. National Railroad Adjustment Board*, 422 F.2d 1187, 1193 (7th Cir. 1970). Comity works most efficiently where previously-filed litigation is brought promptly to the attention of the district court, and the court defers.

*Church of Scientology of California v. U.S. Dep't of Army*, 611 F.2d 738, 750 (9th Cir. 1979).

They may have been able to intimidate the defendant through filing these multiple lawsuits, but they cannot boast about pursuing a strategy that ignores the heavy burden placed on the judiciary, nor should they receive attorneys' fees for pursuing duplicative litigation. If they had really intimidated Bank of America, this would be a push out settlement.

### F. The Contingent Nature of the Litigation

Class Counsel's arguments about the contingent nature also ignore the court's analysis. They address what was an aside by the court -- "class counsel know how to pick a winner." Elsewhere they boast their successes but here they catalogue cases they have lost. The court had said the risks weighed in favor of approving the settlement but losing others doesn't result in a high multiplier here.

What was more troubling to the court was the strategy of duplicative lawsuits. The court noted:

Furthermore, Class Counsel's apparent strategy of filing numerous small, related cases, with a few attorneys working on each, hedges against the risk of recovering nothing for their work. For example, if *Rose* and *Ramirez* had looked unpromising, Class Counsel could simply have chosen not to file *Duke*, *Bradshaw*, *Makin*, and *Johnson*. This strategy also puts heavy pressure on defendants to settle the case early. Finally, because the TCPA has the potential of ruinous financial liability ($500 or $1,500 per violation, and some defendants are accused of millions of violations), defendants will almost always settle if there is any merit at all to the case.

8

CASE NO. 5:11-cv-02390-EJD
OPPOSITION TO CLASS COUNSEL'S MOTION FOR RECONSIDERATION

(Doc. 108, p 21) The court concluded "This factor does not support the requested fee." Class counsel should not be rewarded for a strategy that is duplicative and wastes judicial resources.

The court has not committed a factual error meriting reconsideration. *See Sieverding v. U.S. Dept. of Justice*, D.D.C.2012, 910 F.Supp.2d 149 (refusing to amend judgment dismissing claims under rule allowing for amendment or alteration of judgments, where there was no change in controlling law warranting such an action, no new evidence to be considered, and no clear error to correct or manifest injustice to prevent). There are no errors in undisputed facts in the Court's August 29, 2014 Order and this motion should be denied.

Dated: September 29, 2014      By: ____/s/ Joseph Darrell Palmer_____
                                                               Joseph Darrell Palmer

                                                            Attorney for Objectors James Kirby and Susan House

## CERTIFICATE OF SERVICE

I certify that on September 29, 2014, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the Southern District of California by using the USDC CM/ECF system. I certify that all registered CM/ECF users will be served via the USDC CM/ECF system.

                      ____/s/ Joseph Darrell Palmer_____
                      Joseph Darrell Palmer